## LIMERICK v. HOLDSWORTH et al.

(Supreme Court, Appellate Division, Second Department.  January 28, 1913.)

1. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—ACTIONS—SUFFI-
CIENCY OF EVIDENCE.

In an action for injuries to the driver of a truck, resulting from the
breaking of the tongue, evidence that the tongue, made three months be-
fore the accident from partly green oak timber, showing sun cracks, but
not wormholes, with evidence of wormholes seen after the accident in
the break, which could not be seen prior thereto in the course of requisite
inspection, was insufficient to show negligence of the employer.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954,
956–958, 960–968, 969, 971, 972, 977; Dec. Dig. § 278.*]

2. TRIAL (§ 251*)—INSTRUCTIONS—APPLICABILITY TO CASE.

In an action for injuries to a servant, resulting from the breaking of
the tongue of a truck, where the pleadings raised no issue as to the grain
of the wood in the tongue, an instruction submitting the question whether
the wood was suitable in that respect was erroneous.

[Ed. Note.—For other cases, see Trial, Cent. Dig. §§ 587–595; Dec.
Dig. § 251.*]

Appeal from Trial Term, Kings County.

Action by Charles A. Limerick against William H. Holdsworth and
another.  From a judgment for plaintiff, and an order denying a new
trial, defendants appeal.  Reversed, and new trial granted.

See, also, 136 App. Div. 323, 120 N. Y. Supp. 1011.

Argued before JENKS, P. J., and THOMAS, CARR, WOOD-
WARD, and RICH, JJ.

Frank V. Johnson, of New York City, for appellants.

Ralph G. Barclay, of Brooklyn, for respondent.

THOMAS, J.  Plaintiff, defendant's servant, has recovered dam-
ages for injuries received by the upsetting of a truck driven by him,
whereby a heavy casting fell upon his leg.  While backing the team
from a shed, the pole broke, the right wheel turned under the floor
of the truck, which tipped over on its left side, and the casting was
thrown upon him.  Whether the plaintiff backed out straight, and
the pole broke, allowing the right front wheels to turn under the
truck, as plaintiff contended, or whether the rear wheels of the truck
went to the right, so as to throw the right wheel under the truck
and cause it to turn over, thereby breaking the pole, as the defendant
Percy J. Holdsworth affirmed, was an issue decided by the jury, pre-
sumably in respondent's favor.

[1] The single issue tendered on the question of defendants' neg-
ligence was whether they furnished a reasonably safe tongue or pole.
The plaintiff particularized that the tongue was "defective, rotten,
and worn out."  The pole had been made about three months before,
and there is no evidence of destructive wear.  The contest between
the parties related to wormholes and sun cracks.  The proof is that
the pole was fashioned from partly green oak timber, showing sun
cracks at the time, but not wormholes; that a stick not wholly sea-

soned was preferable for making a pole; that the sun cracks, with drying, would and did close up without serious impairment of the strength of the article, and the jury would not be justified in predicating defendants' negligence upon such condition, and it was error to permit them to consider it. There was some evidence of wormholes after the accident, but the contrary appeared when the pole was made three months before, and there was no reliable evidence that what could be seen was sufficient to give the defendants, in the course of requisite inspection, notice that the pole was unreliable. The plaintiff had handled it, or been in close proximity to it, for months. He had often taken it out and replaced it. He had harnessed his horses to it and detached them on many occasions. He never noticed the alleged defects, and, although he had often backed his truck loaded from the weighing shed, no sign of defect had been given or warning received. In brief, he saw nothing wrong about it.

But who testified to the wormholes? Plaintiff's brother, Thomas Limerick, improperly permitted to relate his denunciations to one of the defendants of the insufficiency of the truck, stated that he found wormholes, "something a little bigger than pinheads—a good deal bigger," and when the pole was broken he could rub off sawdust, but he said that it was something he could not see until after the pole broke. It is noticeable that this witness did not testify to cracks on the former trial, and he also testified:

"The only wormholes I saw were on the surface of this break, in a space of about 12 inches."

The witness' testimony is open to the criticism that it was recast to meet the exigencies of the second trial. Another witness for the plaintiff was Mason, who, as he said, had been convicted on two occasions in his earlier years for not very grievous offenses. He testified, with reference to the place where the break was, that it crumbled away and was rotted, and he further stated that he did not "see anything the matter with the pole, excepting on the surface of this break," and that it could not be seen if it had not been broken, which he ascribed to the fact that the pole was dirty. Walsh, who made the pole, about three months before the accident, testified as to the sun cracks and the length of them; that he did not see any wormholes or knots, and that upon a present inspection of the pole he saw but few; that such cracks disappear as the pole grows older, and that the sun cracks have not much effect upon the pole.

One Shadbolt, a truck builder called by the defendant, testified that the pole was a "tough, fibrous piece of oak"; that he could not see any wormholes in it, and that he did not see any indications of weakness about that pole before the pole broke; and that the sun cracks have very little, if any, effect upon the strength of the pole. He further stated that invariably, in making poles, lumber not thoroughly seasoned was used, and that the sun cracks do not indicate that the pole was weak or defective, and that they were an indication of the toughness of the lumber.

The pole has been presented to the court, and I do not observe that

a witness has pointed out the wormholes. In any case, it is not made to appear that such as exist, and that were not latent, would give notice to an experienced inspector that the pole was weakened thereby, while there is ample and uncontradicted evidence that the sun cracks did not have that effect. It would seem, then, that the finding that the defendant was negligent in furnishing a reasonably safe pole is not sustained by the weight of the evidence, nor is there evidence to sustain a finding that there were wormholes discoverable upon external inspection that lessened its strength.

[2] After the trial had been practically finished, the witness Shadbolt was recalled by the defendant for further examination, and, when that had been concluded, the court conducted an examination of the witness with relation to the manner in which the grain of the wood ran, whereby it appears that the break was from the bottom edge of the pole, and ran diagonally through it to the end of the break for the approximate distance of 3 feet 10 inches, and in doing so it followed the grain. The witness, after stating that in 40 years' experience he had not seen a pole in which the grain ran the entire distance of the pole, considered that such a pole, nonexistent in his knowledge, would be stronger for the continuous grain. No such issue had been raised. It is not contemplated by the bill of particulars, it was not litigated upon the trial, yet the court charged the jury to consider "the nature of the break, and just how it runs, and the grain of the wood, and how it runs," and said:

"Perhaps it may not be without the province of the court and the province of the jury to take some account of the question of the grain of the wood. You will consider the way that pole is broken, either from the bottom to the top, or the top to the bottom, as the case may have been. Does that fact, disclosed in the pole itself, that the particular piece of wood of which it was made was of the quality to sustain the strain of a backing team, hitched to a wagon with heavy iron on it? Jurymen are not supposed to banish the knowledge that they have acquired in life when they enter the jury box. Perhaps it is quite within the knowledge of all of you that a team, pulling a wagon, apply very little strain to the pole, and that the pole is intended to guide the wagon; but a team backing applies great strain to the pole, because the strain is communicated from the front part of the harness to the pole, and the power is there applied. It follows that the weight of the wagon has to be pushed by the pole when a team is backing. Perhaps this is a matter within your own knowledge. Whether or not this particular piece of wood, with the grain running in it as it appears to be running, was a piece of wood suitable to be used in a wagon which was to be backed, heavily laden, is a question for you to determine as experts, which you become."

There is no evidence that the grain could have been discovered, or that the cross grain is excessive or unusual; that it is other than what is used by good and prudent men in the business. Above all, it was not the issue that the parties went to the court to litigate, or that they did litigate. Therefore, for the reasons that the sun cracks did not impute negligence to the defense, that the evidence does not show the injurious presence of wormholes discoverable upon requisite inspection, or that, if they visibly existed, they made the pole unsafe, and because the court submitted to the jury an issue not within the pleadings nor litigated, the judgment and order should be reversed, and a new trial granted, costs to abide the event. All concur.